1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ANGELA MONIQUE B.,

Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security,

Defendant.

Case No.:  19cv0945-RBB

**ORDER REGARDING JOINT
MOTION FOR JUDICIAL REVIEW
OF FINAL DECISION OF THE
COMMISSIONER OF SOCIAL
SECURITY [ECF NO. 17]**

On May 21, 2019, Plaintiff Angela B.[1] commenced this action against Defendant

Andrew M. Saul, Commissioner of Social Security, for judicial review under 42 U.S.C.

§ 405(g) of a final adverse decision for social security benefits [ECF No. 1].  On June 11,

2019, Plaintiff consented to the jurisdiction of Magistrate Judge Nita L. Stormes [ECF

---

[1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local
Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

No. 7].[2]  On August 8, 2019, Judge Stormes transferred this matter to Magistrate Judge
Allison H. Goddard [ECF No. 10].  Defendant filed the Administrative Record on August
28, 2019 [ECF No. 11].  On February 27, 2020, the parties filed a joint motion for
judicial review of the final decision of the Commissioner of Social Security [ECF No.
17].  On April 27, 2020, Judge Goddard transferred this matter to Magistrate Judge
Ruben B. Brooks [ECF No. 18].  Plaintiff consented to Judge Brooks's jurisdiction on
May 18, 2020 nunc pro tunc May 11, 2020 [ECF No. 20].

For the following reasons, Plaintiff's request for reversal or remand is **GRANTED
IN PART AND DENIED IN PART** and the case is **REMANDED** for further
proceedings.

## I.      BACKGROUND

On January 19, 2016, Plaintiff filed an application for disability insurance benefits
under Title II and supplemental security income benefits under Title XVI of the Social
Security Act.  (Admin. R. 20, 247-54, ECF No. 11.)[3]  Angela B. alleged that she has
been disabled since October 15, 2014, due to traumatic brain injury, encephalomalacia,
post-traumatic stress disorder ("PTSD"), depression, migraines, aphasia, vertigo, severe
disorder of the temporomandibular joint ("TMJ"), history of seizure disorder, and chronic
pain.  (Id. at 247, 293.)  Her application was denied on initial review and again on
reconsideration.  (Id. at 159-62, 169-74.)  An administrative hearing was conducted on
May 15, 2018, by Administrative Law Judge ("ALJ") Andrew Verne; on July 11, 2018,
he determined that Plaintiff was not disabled.  (Id. at 20-33.)  Plaintiff requested a review

---

[2] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in
cases of this nature.

[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to
the administrative record using the page references contained on the original document rather than the
page numbers designated by the Court's case management/electronic case filing system ("CM/ECF").
For all other documents, the Court cites to the page numbers affixed by CM/ECF.

of the ALJ's decision; the Appeals Council for the Social Security Administration denied the request for review on May 6, 2019.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

**A.   Plaintiff's History**

Angela B. was born in 1972 and nearly completed her associate's degree in early childhood education in 2005.  (Id. at 45, 247.)  In 2002, she was involved in an automobile accident in which her car went out of control and was hit by another vehicle. (Id. at 322, 416.)  Her five-year-old nephew died in the accident.  (Id. at 322.)  She suffered a traumatic brain injury, was in a coma, and spent a month in the hospital.  (Id. at 62, 70, 356.)  She then spent six weeks in a rehabilitation center to learn how to walk, talk, and feed herself again.  (Id. at 62, 70.)  She and her sister, Elene B., claim that she has not been the same since the accident and has short-term memory loss, can no longer process information in a timely manner, and suffers from depression, anxiety, and PTSD. (Id. at 322, 356.)

Following her accident, Angela B. became addicted to pain medication.  (Id. at 416.)  She worked as a substitute preschool teacher from 2004 to 2007, preschool teacher from 2007 to 2008, pharmacy technician for three months in 2010, and preschool teacher and substitute preschool teacher from 2012 to 2014.  (Id. at 294, 415.)  In 2011, she worked part-time as the daytime care provider for her sister's foster children.  (Id. at 52.)

**B.   Medical Evidence**

**1.   UCSD Gifford Clinic**

Plaintiff first sought treatment at UCSD Gifford Clinic on December 30, 2013. (Id. at 445.)  She told the clinician that she had been receiving care for depression and anxiety at East County Mental Health Clinic and was taking Prozac, Wellbutrin, Seroquel for insomnia, and Topamax, a migraine prophylaxis.  (Id.)  Angela B. indicated that her response to medication had been good.  (Id.)  She reported that she was working full-time

as a substitute teacher, loved her job, and had been offered full-time employment.  (Id. at 445, 446.)  Two weeks earlier, she had run out of medication and felt overwhelmed and anxious.  (Id. at 445.)  When she felt depressed, she spent all day in bed.  (Id.)  Plaintiff stated that in the past, she experienced migraines once per week that were "often very disabling."  (Id. at 446.)  Plaintiff reported that she had previously used methamphetamines but had been clean for ten years, went to Narcotics Anonymous weekly, and had detoxified from alcohol and opiates earlier that year.  (Id.)  The clinician assessed Angela B. as having a history of MDD (major depressive disorder), PTSD, TBI (traumatic brain injury), and multiple substance dependencies.  (Id.)  Plaintiff was advised to continue taking her medications and was referred to social services for assistance with obtaining insurance and a primary care provider.  (Id. at 447.)

Angela B. was seen again at the Gifford Clinic on March 27, 2014.  (Id. at 442.) She reported that she had been experiencing an increase in migraines and had been suspended from work for a week because she had taken four sick days due to her migraines.  (Id.)  She felt depressed because her job gave her positive reinforcement. (Id.)  The clinician increased Plaintiff's Wellbutrin and Topamax dosages, provided her with a small supply of Imitrex, a migraine medication, and encouraged Plaintiff to connect with her primary care provider.  (Id. at 443.)

The treatment notes from Plaintiff's May 4, 2015 visit to the Gifford Clinic indicated that Angela B. was "notably irritable and disheveled" during her appointments in the fall of 2014.  (Id. at 440.)  She admitted to the clinician that she had been "getting high" on pain pills during that time but had been sober for the past six months.  (Id.)  The clinician attributed Plaintiff's previous depression symptoms to using opioids, noted that

Angela B.'s current affect was euthymic,[4] and considered her depression to be resolved. (Id.)  The clinician observed that Plaintiff was in the mourning process for her previous family traumas and car accident.  (Id.)  Plaintiff was instructed to continue taking Prozac and Wellbutrin but that she could start tapering off these antidepressants if she wished. (Id. at 440-41.)  She was also advised to continue taking her migraine medications and to try Benadryl in place of Trazodone for insomnia.  (Id. at 441.)  She was referred for neuropsychological testing to address the traumatic brain injury sustained in her car accident.  (Id.)

On September 2, 2015, Angela B. reported that she was working as a caretaker for her sister's roommate, who had Parkinson's disease.  (Id. at 437, 439.)[5]  She was feeling depressed because she had been off her medications for one week and found caring for her patient difficult because it was hard for her to see him lose his faculties.  (Id. at 437.) The clinician observed that Plaintiff seemed to be slightly worse since her last visit in June 2015 and exhibited a dysphoric[6] mood and increased anxiety.  (Id. at 437-38.) Plaintiff was counseled to follow up with her primary care provider for her prophylactic migraine medications, and individual therapy was recommended to work on cognitive behavioral therapy ("CBT") training.  (Id. at 438.)

Plaintiff next returned to the Gifford Clinic on December 3, 2015.  (Id. at 433.) She stated that her mood was "better" and she was less stressed because the patient she had been caring for had moved to an assisted living facility.  (Id.)  This, however, meant she was paid less, so she was applying for other jobs.  (Id.)  Regarding her PTSD,

---

[4] "Euthymia" describes a normal, tranquil mental state or mood.  See Merriam-Webster, https://www.merriam-webster.com/medical/euthymia (last visited May 8, 2020).

[5] Although this work took place after Plaintiff's alleged onset date of October 15, 2014, the ALJ did not find that she had engaged in any substantial gainful activity since her onset date.  (Admin. R. 23, ECF No. 11.)

[6] "Dysphoric" is defined as "very unhappy, uneasy, or dissatisfied."  See Merriam-Webster, https://www.merriam-webster.com/dictionary/dysphoric (last visited May 8, 2020).

Plaintiff denied having nightmares, flashbacks, hypervigilance, or avoidance, but disclosed that she found long car rides stressful because she feared crashing.  (Id.) Angela B. stated that she had celebrated thirteen months of sobriety with friends.  (Id.) The clinician noted that Plaintiff had been offered individual therapy but had not been able to keep her appointments due to her job schedule.  (Id. at 434.)  Plaintiff was advised to continue taking Prozac and Wellbutrin, and to try Vistaril in place of Benadryl for insomnia.  (Id.)

When Angela B. returned to the Gifford Clinic on March 17, 2016, the clinician noted that she appeared to be stable since her last visit and showed more motivation and energy but exhibited depressed mood due to the recent death of her dog.  (Id. at 485-86.) Plaintiff was advised to continue Prozac; she agreed the dosages for Wellbutrin and Vistaril could be increased to address her depression, anxiety, and insomnia.  (Id. at 486.)

### 2.    Neighborhood Healthcare

Plaintiff was seen at Neighborhood Healthcare by Semise R. Daley, MSN, on February 9, 2016, to establish care.  (Id. at 513.)  On April 5, 2016, Angela B. stated that she continued to have occasional episodes of vertigo caused by the dislocation of her temporomandibular joint.  (Id. at 501-02.)  Nurse Daley noted that Plaintiff was familiar with exercises that could help her vertigo and had not been taking Meclizine,[7] which had previously been prescribed to her to take as needed.  (Id. at 501, 510.)  Plaintiff was instructed to continue taking Topiramate, a migraine prophylaxis, and to start Loratadine and Meclizine to help her vertigo.  (Id. at 503.)  Plaintiff's other medications included Prozac, Wellbutrin, ferrous sulfate, Naprosyn, and hydroxyzine pamoate.  (Id.)

---

[7] Meclizine is an antihistamine used to prevent and treat nausea, vomiting, dizziness, and vertigo.  See Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/meclizine-oral-route/description/drg-20075849 (last visited May 11, 2020).

6

On October 31, 2016, Plaintiff was seen by Dr. Paige Thiermann of Neighborhood Healthcare.  (Id. at 565.)  Angela B. complained of intermittent episodes of vertigo and dizziness, which she attributed to her temporomandibular joint, and for which she also experienced headaches, jaw pain, and tinnitus.  (Id.)  She explained that she had been discharged from the Gifford Clinic due to frequent no shows and had been out of depression medications for two weeks.  (Id. at 565, 568.)  Dr. Thiermann ordered lab work; provided Plaintiff with vertigo exercise materials; referred Plaintiff to an ear, nose, and throat specialist; and started Plaintiff on a lower dose of depression medications.  (Id. at 567.)  Plaintiff continued to be seen at Neighborhood Healthcare on multiple occasions in 2017 but did not mention any additional vertigo episodes.  (Id. at 530-64.)

On July 26, 2017, Nurse Daley ordered a brain MRI and referred Plaintiff to neurology because her migraines were not responding to conventional treatment.  (Id. at 547, 549.)  Angela B. was also instructed to continue taking Naprosyn for pain, Imitrex at the first sign of a migraine, and Topiramate for migraine prophylaxis.  (Id. at 549.)  Plaintiff's subsequent brain MRI, performed on September 19, 2017, showed an area of encephalomalacia[8] involving cortical gray matter and subcortical white matter that was believed to represent an area of old brain injury.  (Id. at 576.)  Mild to moderate white matter changes were noted which were also felt to be due to an old injury.  (Id.)  On February 13, 2018, Angela B. reported that her migraines had not been as severe since she had restarted taking Topamax daily.  (Id. at 530.)

### 3.    Psychiatric consultative examination

Plaintiff underwent a psychiatric consultative examination with Gregory M. Nicholson, M.D., a board-certified psychiatrist, on March 2, 2016.  (Id. at 465.)  Dr.

---

[8] Encephalomalacia is the softening or loss of brain tissue after trauma or injury.  See https://www.ncbi.nlm.nih.gov/pubmed/22134284 (last visited May 11, 2020).

Nicholson noted that Angela B. drove herself to the appointment, arrived on time, and was a reliable historian.  (Id.)  She reported that she was concerned about her memory and was bothered by memories and feelings of guilt about her car accident.  (Id. at 466.)  She stated that she had stopped working as a preschool teacher because of problems with concentrating.  (Id. at 467.)  She was able to perform activities of daily living such as cooking, laundry, and billpaying.  (Id.)  Angela B. said that she had lost interest in bathing and personal hygiene because of her depression.  (Id.)

Dr. Nicholson's diagnoses included opiate dependence, in remission; anxiety disorder, not otherwise specified, based on the history of the traumatic car accident and the current history of PTSD symptoms; and major depressive disorder, based on Plaintiff's history of depressed mood, her dysphoric affect, and neurovegetative symptoms of depression.  (Id. at 469.)  He advised that neuropsychological testing could provide more information about her cognitive functioning.  (Id.)  The examining psychiatrist concluded that Angela B. had mild functional limitations in her abilities to (1) relate and interact with coworkers and the public; (2) maintain concentration, attention, persistence, and pace; (3) maintain regular attendance and perform work activities on a consistent basis; and (4) perform work activities without special or additional instruction, but no other functional limitations.  (Id. at 470.)

### 4.    Internal medicine consultative evaluation

Angela B. received an internal medicine consultative evaluation from Phong T. Dao, D.O., a board-eligible internist, on March 14, 2016.  (Id. at 474.)  She told Dr. Dao that she had sustained a traumatic head injury in her 2002 motor vehicle accident which resulted in "frequent migraine headaches with severe TMJ on the left side."  (Id. at 474-75.)  She stated that her migraines occurred about once a month, lasted one to two hours, and were occasionally accompanied by vertigo with nausea.  (Id. at 475, 478.)  Plaintiff also reported having intermittent neck and low back pain, likely resulting from the motor

vehicle accident; the pain worsened with prolonged sitting, standing, bending, and lifting. (<u>Id.</u> at 475.)  She stated that she did not take any prescription medication for pain relief. (<u>Id.</u>)  Dr. Dao noted that Angela B. had tenderness of the posterior left mandibular joint with deep palpation when she opened her mouth wide.  (<u>Id.</u>)  There was no clicking sound of the temporomandibular joint and she was able to open her mouth wide without difficulty.  (<u>Id.</u> at 476.)  Plaintiff had normal range of motion in her neck but exhibited tenderness to palpation in the C3 to C5 areas.  (<u>Id.</u> at 477.)  She also had normal range of motion in her back with tenderness to palpation in the paraspinal areas at L2 to L4.  (<u>Id.</u>) Plaintiff's straight leg raising tests were negative.  (<u>Id.</u>)

Dr. Dao determined that Angela B. had the following functional capabilities:  she could lift, carry, push, or pull fifty pounds occasionally and twenty-five pounds frequently; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour day; climbing, stooping, kneeling, and crouching should be limited to frequently; and she no manipulative, visual, communicative, or environmental limitations.  (<u>Id.</u> at 479.)

## C. **Vocational Evidence**

Plaintiff received a comprehensive vocational evaluation at Career Services, Inc. on January 5 to 8, 2015, upon the referral of the California Department of Rehabilitation. (<u>Id.</u> at 413.)  She used public transportation, arrived on time each day, and was punctual when returning from lunch and break periods.  (<u>Id.</u>)  Physically, she demonstrated the ability to carry ten pounds for 200 feet and then fifteen pounds for 200 feet before reporting bilateral arm fatigue; stand for several minutes at a time several times a day; walk for twenty minutes at a time; sit for one hour at a time during a six-hour workday; climb stairs; reach with upper extremities; bend and squat; and hold and grasp small objects with reported lack of sensation in the right hand.  (<u>Id.</u> at 417.)  Angela B. demonstrated an average verbal IQ score of 97, a low average performance IQ of 87, a

full scale IQ score of 92, and reading and math comprehension at a twelfth-grade level or higher.  (Id. at 419, 421.)  Barriers to employability included reduced memory functioning and work speed far below usual employment standards.  (Id.)  Louise Dyas, M.S., CRC, the vocational rehabilitation counselor, explained:

> Unfortunately, Ms. Bratton has significant barriers which preclude her from many, if not most, work situations.  She must not work where her safety or the safety of others would be in jeopardy due to her poor memory, lack of concentration/focus, slow mental processing, or slow reactions.  She must not work where any mistakes/errors on her part would jeopardize the health or well-being of others, or would result in an inferior product.  She must not be employed where work speed and/or overall high productivity are expected.  She must not be employed where the physical job duties will cause or exacerbate her pain.

(Id. at 420.)

### D.   **Hearing Testimony**

On May 15, 2018, Angela B. appeared with her attorney and her sister, Elene B., at a hearing before ALJ Verne.  (Id. at 38.)  Vocational expert Connie Guillory, M.S., CRC, also testified.  (Id. at 38, 408.)

#### 1.   **Plaintiff's testimony**

Plaintiff testified that she last worked in October 2014 as a teacher's aide at a childcare center.  (Id. at 50.)  She stopped working at the center after two years because her employer added more responsibilities that were difficult for her to keep up with and pressured her to apply for the job permanently.  (Id.)  She stated that she had also taken a lot of sick days due to her migraine headaches.  (Id.)  Prior to that job, Angela B. worked as a lead teacher at a preschool.  (Id. at 51.)  She stopped working there because it was "extremely stressful" and she ended up in a mental institution for a week because she was not able to keep up with the demands of the job.  (Id. at 51-52.)  Plaintiff needed to work at least an extra hour a day and get help from her family to keep up with her job demands. (Id. at 61.)  In 2010, she obtained a pharmacy technician license, but only worked as a

pharmacy technician for three months before she was fired for not being able to keep up with the pace in a retail pharmacy.  (<u>Id.</u> at 47-48.)  Angela B. testified that she was not able to work because "cognitively I'm super slow" and "I'm very forgetful."  (<u>Id.</u> at 56.)  She explained, "[W]hen I'm given an order, directions, it takes me quite a while to figure out, first of all, what it is that I'm -- that's expected of me, and then to list that, and then to go forth and do it."  (<u>Id.</u>)  She also stated that her migraines prevent her from working because "lines will start to blur" after thirty to forty-five minutes of reading.  (<u>Id.</u> at 57.)  She was referred to a neurologist for her headaches, but she "fall[s] short" with paperwork and with requirements such as headache journals and did not see the neurologist before her referral lapsed.  (<u>Id.</u> at 57-58.)  According to her counsel, Plaintiff did not obtain any medical source statements from her physicians because she was "overwhelmed" by needing to have the forms filled out.  (<u>Id.</u> at 58.)  She last saw a psychiatrist at the Gifford Clinic in 2014.  (<u>Id.</u> at 60.)  Angela B. testified that she experienced migraines twice a week that lasted two to three hours.  (<u>Id.</u> at 65.)  She also stated that she dislocated her jaw in her car accident and it caused her to have jaw pain every day.  (<u>Id.</u> at 86-87.)

### 2.    Plaintiff's sister's testimony

Elene B., Plaintiff's older sister, testified that since the car accident, "[e]verything's different about my sister . . . ."  (<u>Id.</u> at 70.)  She explained, "She used to be really bright, and just really able to articulate, and she was able to work[,]" and she tried "so hard to be normal" by working after she recovered from the accident but it was too overwhelming for her to do so.  (<u>Id.</u> at 70-71.)  She also revealed that Angela B. had many strategies to keep things in order, such as labeling items and recording everything in her smartphone "so she can remember even simple things."  (<u>Id.</u>)  According to Elene B., it took her sister twelve hours to perform the work of an eight-hour job.  (<u>Id.</u>)  Angela B. had difficulty putting sentences together, was unable to remember details, got

19cv0945-RBB

emotionally overwhelmed very easily, and experienced episodes of depression lasting days at a time.  (Id. at 72-73.)  Elene B. also testified that her sister often failed to keep family commitments because she forgot about them or was sick with migraine headaches or vertigo.  (Id. at 74.)  She said that while her sister loved children and was "good with kids," she was unable to maintain any of the paperwork or administrative duties involved in taking care of them in a work-like setting.  (Id. at 77.)  During the testimony of the vocational expert, Elene B. interjected that Angela B.'s jaw dislocation impeded her ability to lift and pull.  (See id. at 84.)

### 3.    Vocational expert's testimony

Vocational expert ("VE") Connie Guillory testified that Plaintiff's prior work consisted of preschool teacher (classified as light, skilled work), nursery school attendant (light, semi-skilled), child monitor (medium, semi-skilled), waitress (light, semi-skilled), and pharmacy technician (light, semi-skilled).  (Id. at 79-81.)[9]  The ALJ posed the following hypothetical question:

> Let's assume a hypothetical person of the claimant's age, education, with the
> past work as described.  Further assume that this individual can lift and

---

[9] Under the Social Security Regulations, occupations are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2019).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  Id. §§ 404.1567(b), 416.967(b).  A job is classified as light "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  If a person is able to do light work, he or she can also generally perform sedentary work.  Id.  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  Id. §§ 404.1567(c), 416.967(c).  A person who can perform medium work can also do sedentary and light work.  Id.

 Jobs are also classified as unskilled, semi-skilled, and skilled.  20 C.F.R. §§ 404.1568, 416.968 (2019).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  Id. §§ 404.1568(a), 416.968(a).  "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties."  Id. §§ 404.1568(b), 416.968(b).  "Skilled work requires qualifications in which a person uses judgment" or "may require dealing with people, facts, or figures or abstract ideas at a high level of complexity."  Id. §§ 404.1568(c), 416.968(c).

12

1
2
3
4
5
6
7
8
9
10

carry, push and pull 50 pounds occasionally, 25 pounds frequently. This person is capable of standing and/or walking six hours and sitting six hours in an eight-hour workday with normal breaks. This person can frequently climb ramps and stairs, ropes, ladders and scaffolds, balance, stoop, kneel, crouch and crawl. Actually, unlimited balance for this one. So, and this person should also avoid concentrated exposure to noise, extreme cold, fumes, dust, gases, odors and other pulmonary irritants. This person would also be limited to -- let's have it -- add this to it, that she's limited to understand and remember and carrying out simple, routine, repetitive tasks, with breaks every two hours, to no interaction with the general public, and to occasional work-related, non-personal, non-social interaction with coworkers and supervisors involving no more than a brief exchange of information or handoff of product, in an environment where there are few workplace changes.

11

(Id. at 82.)

12
13
14
15
16
17
18
19
20

   In response, the VE stated that the claimant in the hypothetical would not be able to perform Plaintiff's past work but could perform the jobs of bag loader, checker weigher, and stores laborer, all of which are medium, unskilled jobs. (Id. at 82-83.)[10] When the ALJ modified the hypothetical question to include occasional balancing, avoidance of concentrated exposure to hazards including unprotected heights and dangerous moving machinery, occasional climbing ramps and stairs, and no ropes, ladders, or scaffolds, the VE testified that the hypothetical person could still perform the three positions she had identified. (Id. at 83, 85.) If the hypothetical person was "off

21
22
23
24
25
26
27
28

---

[10] The Dictionary of Occupational Titles ("DOT") numbers for these positions are 737.687-014, 369.687-014, and 922.687-058, respectively. (Admin. R. 83, ECF No. 11.) A bag loader is a type of hand packer who loads ammunition charge bags with previously weighed quantities of powder. See id.; DICOT 737.687-014, 1991 WL 680044. A checker weigher works in the laundry industry and verifies the number and type of laundered or dry cleaned articles by checking against customers' lists. See DICOT 369.687-014, 1991 WL 673071. A stores laborer, also known as an order picker, parts picker, stock selector, or warehouse worker, performs tasks relating to receiving, storing, and distributing material, tools, equipment, and products within establishments. See DICOT 922.687-058, 1991 WL 688132.

13

19cv0945-RBB

1   task" ten percent or more on a consistent basis, that person would not be able to perform

2   any work.  (Id. at 85.)  Similarly, if the person missed three or more days of work in a

3   month, no work would be available to her.  (Id.)  If the person were limited to a full range

4   of light work or sedentary work, light or sedentary jobs would be available.  (Id.)

5   **E.    ALJ's Decision**

6           On July 11, 2018, the ALJ issued a decision finding that Angela B. had not been

7   under a disability, as defined in the Social Security Act, from her alleged onset date

8   through the date of the decision.  (Id. at 20-33.)  Judge Verne stated that Plaintiff met the

9   insured status requirements of the Social Security Act through March 31, 2018.  (Id. at

10  22.)  He determined that Plaintiff had not engaged in substantial gainful activity since

11  October 15, 2014, the alleged onset date.  (Id. at 23.)  The ALJ found that Angela B. had

12  the following severe impairments:  an anxiety disorder, a major depressive disorder, a

13  post-traumatic stress disorder, an unspecified personality disorder, and a traumatic brain

14  injury consisting of moderate cortical/subcortical encephalomalacia.  (Id.)  The ALJ

15  considered Plaintiff's opiate dependence, in remission; other stimulant dependency with

16  heavy methamphetamine use, in remission; alcohol abuse, in remission; cannabis abuse,

17  in remission; genital herpes simplex of unspecified site; dysmenorrhea; jaw pain; vertigo;

18  and history of partial thyroid removal to not be severe impairments.  (Id. at 25-26.)  The

19  ALJ found that, singly or in combination, Plaintiff did not have impairments that met or

20  medically equaled a listing.  (Id. at 26.)  He further determined that Angela B. had the

21  residual functional capacity ("RFC")[11] to perform medium work except she could never

22  climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs; could

23  occasionally balance and frequently stoop, kneel, crouch, and crawl; should avoid

24

25

26  [11] Residual functional capacity is "the most you can still do despite your limitations."  See 20 C.F.R. §§
    404.1545(a)(1), 416.945(a)(1) (2019).

27

28

concentrated gasses and odors as well as concentrated exposure to workplace hazards; would be limited to understanding, remembering, and carrying out simple, routine, repetitive tasks with breaks every two hours; and should have no interaction with the public and occasional work-related, non-personal, non-social interactions with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product in an environment where there are few workplace changes.  (Id. at 27.) The ALJ concluded that Plaintiff was unable to perform her past relevant work but could perform the requirements of representative occupations such as bag loader, checker weigher, or stores laborer.  (Id. at 31-33.)

## II.   LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. §

405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id.

§ 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

## III.   DISCUSSION

Plaintiff argues that the ALJ erred by failing to properly consider the results of her vocational testing and by improperly assessing her subjective complaints.  (Joint Mem. 12-15, 19-23, 32-34, ECF No. 17.)

**A.**   **The ALJ Did Not Sufficiently Articulate His Evaluation of the Vocational Report and Failed to Incorporate its Findings into Plaintiff's RFC.**

Angela B. was evaluated by vocational counselor Louise Dyas, M.S., CRC, who determined that Plaintiff "has significant barriers which preclude her from many, if not most, work situations," including reduced memory functioning and work speed far below usual employment standards.  (Admin. R. 419-20, ECF No. 11.)  Plaintiff argues that the ALJ failed to consider Ms. Dyas's findings or the objective test results from Plaintiff's vocational testing.  (Joint Mem. 13-15, ECF No. 17.)  The Commissioner contends in response that "the ALJ plainly considered Ms. Dyas's statements and reasonably found that they did not endorse limitations beyond those already contained in [his RFC findings]."  (Id. at 17.)

Under the Social Security Regulations, "evidence is anything you or anyone else submits to us or that we obtain that relates to your claim."  See 20 C.F.R. §§ 404.1513(a), 416.913(a) (2019).  The categories of evidence include objective medical evidence, medical opinions, other medical evidence, and evidence from nonmedical sources.  Id. §§

404.1513(a)(1)-(4), 416.913(a)(1)-(4).  Evidence from nonmedical sources is defined as "any information or statement(s) from a nonmedical source (including you) about any issue in your claim."  See id. §§ 404.1513(a)(4), 416.913(a)(4).  Nonmedical sources, previously referred to as "other sources" of evidence, include teachers, counselors, social welfare agency personnel, relatives, and friends, among others.  See 20 C.F.R. §§ 404.1513(d), 416.913(d) (2013).[12]  Vocational rehabilitation counselors and vocational evaluators are not considered to be medical sources but rather qualify as nonmedical "other sources" of evidence.  See, e.g., Kenneth V. v. Saul, 2019 WL 3818283, at *2 (C.D. Cal. Aug. 14, 2019); James W. v. Comm'r of Soc. Sec., 2018 WL 4955208, at *9 (E.D. Wash. Oct. 12, 2018).

The evaluation of opinion evidence for claims filed before March 27, 2017, such as Plaintiff's, is governed by 20 C.F.R. §§ 404.1527 and 416.927 for disability insurance and supplemental security income benefits, respectively.  See 20 C.F.R. §§ 404.1513, 416.913, 404.1527, 416.927 (2019).  These regulations set forth the "consideration" an ALJ must give to opinions from nonmedical sources, (see id. §§ 404.1527(f)(1), 416.927(f)(1)), as well as the "articulation" required by the ALJ regarding his evaluation of such opinions, (see id. §§ 404.1527(f)(2), 416.927(f)(2)).  With respect to "consideration," the regulations provide that although the ALJ is required to consider opinion evidence from nonmedical sources using the same factors applicable to the evaluation of medical opinions, "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from . . . a nonmedical source

---

[12] The current versions of 20 C.F.R. §§ 404.1513 and 416.913 became effective on March 27, 2017.  See 20 C.F.R. §§ 404.1513, 416.913 (2019).  The prior versions of the regulations, effective from September 3, 2013 to March 26, 2017, included nonmedical sources in their "other sources" category of evidence.  See 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4) (2013).

1    depends on the particular facts in each case." Id. §§ 404.1527(f)(1), 416.927(f)(1).[13]

2    Regarding "articulation," the ALJ "generally should explain the weight given to the

3    opinions from these sources or otherwise ensure that the discussion of the evidence in the

4    determination or decision allows a claimant or subsequent reviewer to follow the

5    adjudicator's reasoning, when such opinions may have an effect on the outcome of the

6    case." Id. §§ 404.1527(f)(2), 416.927(f)(2).  An ALJ must give reasons "germane" to

7    each source in order to discount evidence from nonmedical "other sources" of evidence.

8    Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017) (citing Molina v. Astrue, 674 F.3d

9    1104, 1111 (9th Cir. 2012)).

10          In this case, vocational counselor Ms. Dyas opined that Angela B. "has significant

11   barriers which preclude her from many, if not most, work situations."  (Admin. R. 420,

12   ECF No. 11.)  The primary barriers observed by Ms. Dyas included reduced memory

13   functioning and work speed far below usual employment standards.  (Id. at 419.)

14   Although the ALJ discussed the vocational report in his decision and noted the report's

15   reference to Plaintiff's short-term memory issues, focus problems, and slow mental

16   processing, (see id. at 27-28), it is not entirely clear to the Court how much consideration

17   he gave to its findings.  He did not explicitly accept, reject, or discount Ms. Dyas's

18   opinions or the findings in the vocational report.  The ALJ's recitation of the evidence

19   does not allow a reviewing court to follow his reasoning.  See 20 C.F.R. §§

20   404.1527(f)(2), 416.927(f)(2).

21          Contrary to Defendant's argument, the findings in the vocational report are not

22   fully reflected in the ALJ's determination of Angela B.'s RFC.  The RFC formulated by

23   the ALJ limited Plaintiff to "understanding, remembering, and carrying out simple,

24

25   _____

26   [13] The factors considered in deciding the weight given to medical opinions includes the examining
     relationship, treatment relationship, supportability, consistency, specialization, and other factors.  See 20
27   C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

28

1  routine, repetitive tasks" with no interaction with the general public and limited work

2  interactions in a workplace with few changes.  (Admin. R. 27, ECF No. 11.)  The RFC

3  also restricted Angela B. to jobs that do not involve climbing ladders, ropes, or scaffolds

4  or exposure to workplace hazards such as unprotected heights or dangerous or fast-

5  moving machinery.  (Id.)  While the RFC incorporates Ms. Dyas's suggestion that

6  Plaintiff should not work in a setting where her own safety or that of others could be in

7  jeopardy due to her poor memory, lack of concentration and focus, slow mental

8  processing, and slow reactions, it does not address the vocational counselor's finding that

9  Plaintiff's work speed was far below usual employment standards.  (See id. at 419; see

10  also id. at 420 (stating that Angela B. "must not be employed where work speed and/or

11  overall high productivity are expected").)

12        The ALJ was entitled to discount the findings in the vocational report provided he

13  gave reasons germane for doing so.  Popa, 872 F.3d at 906 (citing Molina, 674 F.3d at

14  1111).  He did not articulate any reasons, let alone germane reasons, relating to his

15  consideration of the report.  Moreover, discounting the findings in the vocational report

16  that Plaintiff's work speed was far below usual employment standards would have been

17  wholly inconsistent with the ALJ's acceptance in his decision of medical and nonmedical

18  evidence that Plaintiff has moderate difficulty maintaining concentration, persistence, and

19  pace.  (See Admin. R. 31, ECF No. 11 (granting substantial weight to opinions of state

20  agency physicians Drs. Garland and Covey, who both found that Plaintiff has moderate

21  difficulty maintaining concentration, persistence, and pace); see also id. at 29 (giving

22  significant weight to adult function reports completed by Plaintiff and her sister which

23  both indicated that Angela B. has "difficulty staying focused and difficulty completing

24  tasks and generally performing things slower than other people").)  Thus, the ALJ did not

25  discount the findings in the vocational report but attempted to incorporate Plaintiff's

26

27                                      20

28

limitations regarding concentration, persistence, and pace by limiting her to "simple, routine, repetitive tasks" in his RFC.  (Id. at 27.)

That restriction, however, does not adequately capture a claimant's limitations as to concentration, persistence, and pace.  The Commissioner, citing Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008), contends that the ALJ reasonably translated Plaintiff's mental functioning difficulties into the functional limitations in the RFC.  (Joint Mem. 16, ECF No. 17.)  In Stubbs-Danielson, the Ninth Circuit held that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."  Id. (citations omitted).  There, the record contained some evidence of the plaintiff's slow pace, but the only "concrete" functional limitation articulated by a medical source was that the plaintiff could perform "simple tasks."  Id. at 1173-74.  The Ninth Circuit concluded that the ALJ did not err in his formulation of the RFC, which limited the claimant to "simple, routine, repetitive" work because it was consistent with the medical record.  (Id.)

The holding in Stubbs-Danielson was distinguished by Brink v. Comm'r of Soc. Sec., 343 Fed. App'x 211 (9th Cir. 2003), a subsequent unpublished Ninth Circuit decision.  In Brink, the ALJ acknowledged that the plaintiff had moderate difficulty with concentration, persistence, or pace, but posed a hypothetical question to the vocational expert based on an RFC that referenced only "simple, repetitive work" without including any limitations on concentration, persistence, or pace.  Id. at 212.  The Ninth Circuit in Brink distinguished the holding in Stubbs-Danielson as follows:

> In Stubbs-Danielson . . . , we held that an 'assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony.'  [Stubbs-Danielson, 539 F.3d] at 1174.  The medical testimony in Stubbs-Danielson, however, did not establish any limitations in concentration, persistence, or pace.  Here, in contrast, the medical evidence

21

establishes, as the ALJ accepted, that Brink does have difficulties with concentration, persistence, or pace.  Stubbs-Danielson, therefore, is inapposite.

Id.

In this case, as in Brink, the ALJ recognized that the evidence in the record supports that Plaintiff has moderate difficulties with concentration, persistence, or pace. (See Admin. R. 29, 31, ECF No. 11).  Unlike Stubbs-Danielson, however, there are no medical source opinions relied on by the ALJ that despite her slow pace, Plaintiff could perform "simple, routine, repetitive tasks."  This case is more analogous to Brink than to Stubbs-Danielson.  Other district courts have similarly found Stubbs-Danielson not controlling in circumstances akin to those here.  See, e.g., Jahnsen v. Berryhill, 265 F. Supp. 3d 992, 1000 (D. Alaska 2017) (distinguishing Stubbs-Danielson on the basis that the ALJ had no recommendation from any medical source that the plaintiff's moderate limitations as to concentration, persistence, or pace could be translated into a restriction to simple work or to a low-stress job with little decision making and public contact); King v. Berryhill, Case No. 8:17-cv-00875-GJS, 2018 WL 2328217, at *3 (C.D. Cal. May 22, 2018) (distinguishing Stubbs-Danielson and relying on Brink because the medical record did not contain evidence that simple, repetitive tasks could be performed with the plaintiff's slow processing speeds); Feltis v. Astrue, 2:11-cv-00723 KJN, 2012 WL 2684994, at *4 (E.D. Cal. July 6, 2012) (relying on Brink notwithstanding it being an unpublished decision due to its instructiveness in distinguishing Stubbs-Danielson). Therefore, the Court finds that the ALJ in this case erred in his formulation of the RFC and associated hypothetical question to the VE which both referenced only "simple, routine, repetitive tasks" without including limitations on concentration, persistence, or pace.  See Brink, 343 Fed. App'x at 212.

Substantial evidence in the record supports the ALJ's finding that Angela B. is unable to perform her past relevant work.  (See id. at 31.)  Her previous occupations,

22

19cv0945-RBB

including preschool teacher, waitress, and pharmacy technician, which are each skilled or semi-skilled positions, (see id. at 80-81), were certainly more demanding that the unskilled jobs involving "simple, routine, repetitive tasks" identified by the VE during the hearing.  Because the RFC was incomplete, however, it is unclear whether there are unskilled jobs available that will accommodate the limitations the ALJ recognized regarding Plaintiff's concentration, persistence, and pace, as unskilled work may have speed and productivity requirements.  "Indeed, repetitive, assembly-line work . . . might well require extensive focus or speed."  Brink, 343 Fed. App'x at 212.

In sum, the Court is unable to follow the ALJ's reasoning as it relates to his evaluation of the vocational report and Ms. Dyas's opinions.  While he recognized that Plaintiff had difficulty staying focused, difficulty completing tasks, and generally performed things slower than other people, (see Admin. R. 29, ECF No. 11), which was wholly consistent with Ms. Dyas's determination that Plaintiff's work speed was far below usual employment standards, (see id. at 419), the ALJ did not incorporate any limitations as to concentration, persistence, and pace in his RFC or hypothetical question to the VE.  Remand is necessary for the ALJ to provide appropriate consideration to, and the required articulation of, Ms. Dyas's opinions and the findings in her vocational report, (see 20 C.F.R. §§ 404.1527(f)(1)-(2), 416.927(f)(1)-(2)), and, in all likelihood, to modify Plaintiff's RFC and hypothetical questions to the VE to include her limitations as to concentration, persistence, and pace.  See Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981) ("If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.").

**B.      The ALJ Properly Evaluated Plaintiff's Subjective Complaints.**

The ALJ set forth eight reasons for discounting Plaintiff's subjective allegations regarding her symptoms and functional limitations.  (See Admin. R. 29-31, ECF No. 11.) Plaintiff disputes each of these reasons.  (Joint Mem. 21-23, ECF No. 17.)  Defendant

1   contends that the ALJ properly assessed Angela B.'s subjective allegations.  (Id. at 23-
2   32.)

3           An ALJ engages in a two-step analysis to determine the extent to which a
4   claimant's report of symptoms must be credited.  First, an ALJ must determine whether
5   the claimant has presented objective medical evidence of an underlying impairment
6   which could reasonably be expected to produce the pain or other symptoms alleged.
7   Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison v. Colvin, 759
8   F.3d at 1014-15).  In this analysis, the claimant is not required to show that her
9   impairment could reasonably be expected to cause the severity of the symptoms alleged;
10  nor is she required to produce objective evidence of the pain or its severity.  Id. (citing
11  Garrison v. Colvin, 759 F.3d at 1014-15).  If the claimant satisfies step one of the
12  analysis, and there is no evidence of malingering, the ALJ can reject the claimant's
13  testimony about the severity of her symptoms only by offering "specific, clear and
14  convincing reasons" for doing so.  Id.

15          Here, ALJ Verne determined that Angela B. satisfied step one of the two-step
16  analysis.  (Admin. R. 31, ECF No. 11.)  Nevertheless, he found Plaintiff's allegations
17  concerning the intensity, persistence, and limiting effects of her symptoms were "not
18  entirely consistent with the medical evidence and other evidence in the record[.]"  (Id.)
19  He articulated eight reasons for his finding.

20          **1.      Activities of daily living**

21          First, Judge Verne reviewed the evidence of Angela B.'s daily activities and found
22  them inconsistent with her allegations of disabling symptoms.  (Id. at 29-30.)  An ALJ
23  may properly consider the claimant's daily activities in evaluating testimony regarding
24  subjective pain.  See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see
25  also 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (claimant's daily activities relevant
26  to evaluating symptoms).  The ALJ may consider inconsistencies between the claimant's

27
28

19cv0945-RBB

1  testimony and the claimant's conduct, as well as whether the claimant engages in

2  activities inconsistent with the alleged symptoms.  Molina, 674 F.3d at 1112 (quotations

3  and citations omitted).  "One does not need to be 'utterly incapacitated' in order to be

4  disabled."  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing Fair v. Bowen,

5  885 F.2d 597, 603 (9th Cir. 1989)).  Nevertheless, "[e]ven where [a claimant's] activities

6  suggest some difficulty functioning, they may be grounds for discrediting the claimant's

7  testimony to the extent that they contradict claims of a totally debilitating impairment."

8  Molina, 674 F.3d at 1113 (citations omitted).

9  　　　Here, the ALJ could reasonably conclude that Angela B.'s activities, including

10  performing light household chores, preparing her own meals, attending multiple support

11  group meetings every week, and socializing with family members undermined her

12  testimony that she was incapable of working.  (See Admin. R. 29-30, ECF No. 11.)

13  Plaintiff's daily activities therefore constituted a clear and convincing reason to discredit

14  her testimony regarding the functional limitations caused by her symptoms.

15  　　　**2.　　Migraine headaches**

16  　　　Next, the ALJ found that Plaintiff's migraine headaches would not limit her in any

17  significant way.  (Id. at 30.)  The evidence in the record reflects that Plaintiff experienced

18  frequent disabling migraines which at times impeded her ability to work in 2013 and

19  2014.  (Id. at 442, 446.)  In 2015, she told the vocational counselor that she only

20  experienced migraines once a month and that her prescribed medication, Topamax,

21  helped to lessen her pain.  (Id. at 416.)  In 2018, Plaintiff reported that her migraines were

22  less severe once she resumed taking Topamax on a daily basis.  (Id. at 530.)  In assessing

23  a claimant's subjective symptoms, an ALJ may properly consider the frequency of her

24  pain as well as whether the claimant had a "fair response" to treatment.  See 20 C.F.R. §§

25  404.1529(c)(3)(ii), (iv); 416.929(c)(3)(ii), (iv); see also Odle v. Heckler, 707 F.2d 439,

26  440 (9th Cir. 1983).

1   The ALJ's second reason for discounting Plaintiff's symptom testimony is clear

2   and convincing because he could properly find, based on the record, that Plaintiff's

3   migraines "would not limit her in any significant way."  (Admin. R. 30, ECF No. 11.)

4   ### 3.  Substantial gainful activity following traumatic brain injury

5   The ALJ's third reason for discrediting Plaintiff's subjective symptom testimony

6   was that she was able to work for many years following her motor vehicle accident and

7   earned substantial gainful activity levels of income.  (Id.)  The Court agrees with Plaintiff

8   that the record reflects that she was required to spend far more time completing her

9   previous job tasks than the average individual and that she was eventually unable to keep

10  working due to being "overwhelmed by life."  (Joint Mem. 22, ECF No. 17.)

11  Nonetheless, an ALJ may properly consider whether a claimant's history of symptoms

12  prevented her from working.  See, e.g., Gregory v. Bowen, 844 F.2d 664, 666-67 (9th

13  Cir. 1988) (finding that the plaintiff's ability to work with back pain that had remained

14  constant over a number of years supported the ALJ's finding that the claimant was not

15  disabled); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (explaining that ALJ

16  could properly find that limitations were not disabling when they did not prevent

17  claimant from completing high school, obtaining a college degree, finishing a nurse's

18  aide training program, and attending military training).  Plaintiff's substantial gainful

19  activity following her car accident constitutes a clear and convincing reason for the ALJ

20  to discount her subjective symptom testimony.

21  ### 4.  IQ score

22  The ALJ's next reason for discounting Plaintiff's subjective symptom testimony

23  was her full scale IQ score of 92, which falls within the average range of intellectual

24  functioning.  (See Admin. R. 30, 421, ECF No. 11.)  It was reasonable for the ALJ to

25  consider Plaintiff's intellectual aptitude as part of his analysis of her subjective symptom

26  complaints.  "IQ testing plays a particularly important role in assessing the existence of

27

28

1    intellectual disability." <u>Garcia v. Comm'r of Soc. Sec.</u>, 768 F.3d 925, 931 (9th Cir.

2    2014).  Thus, the ALJ's fourth reason for discounting Plaintiff's pain testimony is clear

3    and convincing.

4          **5.    Resolution of depression symptoms**

5          The ALJ observed that Plaintiff's depression symptoms resolved in 2015 after she

6    stopped getting high on opioids.  (Admin. R. 30, ECF No. 11; <u>see also id.</u> at 440-41.)

7    The record shows, however, that Angela B.'s depression resumed after 2015, requiring

8    her to continue taking depression medications.  (<u>See id.</u> at 485-86 (showing that Plaintiff

9    agreed to increase her Wellbutrin and Vistraril in March 2016 to address her depression,

10   anxiety, and insomnia); 565-67 (prescribing depression medications after Plaintiff had

11   been out of medications for two weeks in October 2016).)  Indeed, the psychiatric

12   consultative examiner, Dr. Nicholson, noted that Plaintiff presented with depressed mood

13   during his examination in 2016.  (<u>Id.</u> at 469.)  The resolution of Plaintiff's depressive

14   symptoms in 2015 does not constitute a clear and convincing reason to discredit her

15   subjective symptoms.

16         **6.    Lack of candor regarding substance abuse**

17         The next reason stated by the ALJ for discounting Plaintiff's subjective symptoms

18   was her apparent lack of candor with Dr. Nicholson regarding her substance abuse.  (<u>Id.</u>

19   at 30.)  ALJ Verne noted that Angela B. told Dr. Nicholson only that she "used to drink"

20   but denied any problems in her life related to drinking, and she only revealed that she had

21   used opioids Vicodin and Percocet excessively.  (<u>Id.</u> at 30, 466.)  In actuality, Plaintiff

22   had prior heavy methamphetamine use, drank alcohol heavily, had an opioid dependence,

23   and had used marijuana.  (<u>See id.</u> at 416, 440, 446.)  The Commissioner contends that the

24   ALJ could rely on Plaintiff's inconsistent statements regarding her history of substance

25   abuse to discount her symptom testimony.  (Joint Mem. 30-31, ECF No. 17.)  But

26   according to Social Security Ruling ("SSR") 16-3p, the ALJ must limit his evaluation of

27

28

a claimant's symptoms to "the evidence in the record that is relevant to the individual's impairments." SSR 16-3p, 2017 WL 5180304, at *11 (Oct. 25, 2017).[14] "The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." Id. The ALJ's observation of Plaintiff's alleged lack of candor regarding her substance abuse history is not relevant to her impairments but rather appears to be an assessment of her veracity, and thus it does not constitute a clear and convincing reason to reject her pain testimony.

### 7. Lack of listing level impairment

The Commissioner acknowledges that the lack of a medical opinion that Angela B. had a listing level impairment was not a proper reason to find Plaintiff's subjective symptom testimony not fully supported. (Joint Mem. 31 n.8, ECF No. 17.) Thus, the ALJ's seventh proffered reason for discounting Plaintiff's subjective symptoms is not clear and convincing.

### 8. Lack of medically determinable impairment lasting twelve or more continuous months

Defendant also acknowledges that the ALJ could not properly discount Plaintiff's subjective symptoms on the basis that the objective evidence of record did not establish impairments likely to produce disabling pain or other limitations for any period of twelve or more continuous months. (Id.) Therefore, this reason is not clear and convincing.

Although not all of the reasons set forth by the ALJ were clear and convincing, the ALJ articulated sufficient clear and convincing reasons to discount Plaintiff's subjective

---

[14] SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms, and applies to decisions rendered on or after March 28, 2016. SSR 16-3p, 2017 WL 5180304, at *1-*2. The Ninth Circuit stated that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms . . .' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo, 871 F.3d at 678 n.5 (citing SSR 16-3p).

symptom testimony to the extent he did in reaching his decision.  Accordingly, the Court finds that the ALJ properly evaluated Plaintiff's subjective complaints.

### III.   CONCLUSION

For the reasons stated above, Plaintiff's request for reversal or remand is **GRANTED IN PART AND DENIED IN PART** and the case is **REMANDED** for further proceedings.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  May 28, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

29

19cv0945-RBB